**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | |
| **ALEJANDRO** | : | **NO. 1:09-CR-359-RWS-AJB** |
| **ACOSTA-SOBERANIS,** | : | **NO. 1:09-CR-361-RWS-AJB** |
| | : | |
| **Defendant.** | : | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b). The Clerk is **DIRECTED** to serve upon counsel for

the parties and directly upon any unrepresented parties a copy of the R&R and a copy

of this Order.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order. Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and be served upon the opposing party. *See*

*United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing

objections will be responsible for obtaining and filing the transcript of any evidentiary

hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  3rd  day of  April  , 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | |
| **ALEJANDRO** | : | **NO. 1:09-CR-359-RWS-AJB** |
| **ACOSTA-SOBERANIS,** | : | **NO. 1:09-CR-361-RWS-AJB** |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court is the issue whether Defendant Alejandro Acosta-Soberanis

("Soberanis") is competent to stand trial. For the reasons below, the undersigned

**RECOMMENDS** that Soberanis be declared **NOT COMPETENT TO STAND**

**TRIAL** and **NOT RESTORABLE**. Further, the undersigned concludes that the Court

is precluded at this time from determining Soberanis's dangerousness, but

**RECOMMENDS** that the Attorney General be **DIRECTED** to effect formal

certification regarding Soberanis's dangerousness, as discussed below.

## I.     Procedural History

The relevant procedural history is as follows.

Soberanis is charged in the indictment in Case No. 1:09-CR-359-RWS-AJB with

conspiring to distribute and possess with the intent to distribute at least five kilograms

of cocaine (Count One), two counts of possessing with the intent to distribute at least five kilograms of cocaine (Count Three and Five), and conspiring to launder money (Count Six). [Doc. 22 at 1-7 in 1:09-CR-359-RWS-AJB].[1] Soberanis is charged in the superseding indictment in Case No. 1:09-CR-361-RWS-AJB with conspiring to distribute and possess with the intent to distribute at least five kilograms of cocaine (Count One), conspiring to launder money (Count Four), and money laundering (Count Seven). [Doc. 82 at 2-7, 9-10 in 1:09-CR-361-RWS-AJB]. Soberanis was arraigned on August 7, 2009 (Case No. 1:09-CR-359-RWS-AJB) and September 4, 2009 (Case No. 1:09-CR-361-RWS-AJB), and pleaded not guilty. [Doc. 48; Doc. 133 in Case No. 1:09-CR-361-RWS-AJB]. On October 8, 2009, Soberanis moved for a psychiatric exam to determine his competency to stand trial and his mental condition at the time of the alleged offenses. [Doc. 90]. The undersigned granted the motion on October 19, 2009, authorizing Dr. Adriana Flores, Ph.D., to examine Soberanis at the Corrections Center where he was then incarcerated. [Doc. 92].

On December 1 and 2, 2009, two under-seal motions were filed by Defendant. [Docs. 102, 103]. On December 11, 2009, addressing the motions, the undersigned

---

[1] Unless otherwise indicated, all docket citations are references to Case No. 1:09-CR-0359-RWS-AJB.

AO 72A
(Rev.8/8 2)

noted the parties' agreement that Soberanis should undergo a mental-competency examination and should be evaluated at the Federal Medical Center in Butner, North Caroline ("FMC Butner") or some other similar federal medical facility, and the undersigned thus committed Soberanis to the custody of the Attorney General for this purpose. [Doc. 105].

A letter from the warden at FMC Butner to the undersigned dated March 31, 2010, and accompanied by a psychiatric evaluation dated March 23, 2010 ("March 2010 Report"), indicates that Soberanis was not then competent to stand trial but was restorable. (Gov't Ex. 1).[2]

On April 5, 2010, the undersigned noted the following: (1) on April 2, 2010, the Court received a mental-competency report dated March 31, 2010, concluding that Soberanis was mentally incompetent to stand trial; (2) neither party objected to the findings made in the report; and (3) the Court found by a preponderance of the evidence that Soberanis was then suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

---

[2]    All cited exhibits refer to exhibits presented at the November 9, 2011, competency hearing.

AO 72A
(Rev.8/8
2)

[Doc. 119 at 1]. The undersigned therefore ordered Soberanis committed to the custody of the Attorney General and ordered the Attorney General to hospitalize Soberanis in a suitable facility for a reasonable period of time, not to exceed four months, as was necessary to determine whether there was a substantial probability that in the foreseeable future Soberanis would attain the capacity to permit the trial to proceed. [*Id.* at 1-2].

A letter from the warden at FMC Butner to the undersigned dated August 30, 2010, and accompanied by a psychiatric evaluation dated August 3, 2010 ("August 2010 Report"), indicates that Soberanis was competent to stand trial. (Gov't Ex. 2).

On September 29, 2010, the undersigned set a competency hearing for November 15, 2010, [Doc. 141], although this was later rescheduled for December 21, 2010, [Doc. 146].

Following a telephone conference on November 23, 2010, [Doc. 147], the undersigned ordered Soberanis transferred from his then-current facility, Geo-Care, to the FMC Butner for further evaluation and treatment pending his December 21, 2010, competency hearing, [Doc. 148]. On December 21, 2010, the competency hearing was again rescheduled, for January 24, 2011, [Doc. 152], and the Order directing

4

AO 72A
(Rev.8/8
2)

Soberanis's transfer from Geo-Care to FMC Butner was rescinded on December 27, 2010, [Doc. 153].

On January 24, 2011, a status conference was held in lieu of a competency hearing, [Doc. 155], and the undersigned entered an Order (1) finding, by consent of the parties, that Soberanis was suffering from severe depression rendering him mentally incompetent to stand trial, (2) noting that the parties' respective experts believed that Soberanis's competency was restorable, and (3) ordering Soberanis committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d) to determine whether there was a substantial possibility that in the foreseeable future he would attain the capacity to permit the proceeding to go forward, [Doc. 156 at 1]. The Court strongly recommended that the Bureau of Prisons designate Soberanis to FMC Butner for his competency-restoration proceedings. [Doc. 156 at 1].

A competency hearing was set for July 27, 2011, [*see* Dkt. Entry dated 06/28/11], but a telephone conference was held instead, [Doc. 171]. At the telephone conference, the Government indicated that it was waiting on another report from FMC Butner to see if Soberanis was competent or restorable. [Doc. 171].

A letter from the warden at FMC Butner to the undersigned dated August 1, 2011, and accompanied by a psychiatric evaluation dated July 29, 2011 ("July 2011

5

Report"), indicates that Soberanis was not competent to stand trial, nor was there a substantial possibility that his competency would be restored in the foreseeable future. (Gov't Ex. 3).

On August 11, 2011, the undersigned enter an Order (1) noting that on August 1, 2011, evaluators at Butner opined that Soberanis was not competent and that there "is not a substantial probability that his competency will be restored in the foreseeable future," (2) directing that Soberanis remain in the custody of the Attorney General for designation to a Medical Referral Center to undergo a risk assessment pursuant to 18 U.S.C. § 4246, and (3) strongly recommending that Soberanis remain at FMC Butner for this risk assessment. [Doc. 172].

A letter from the warden at FMC Butner to the undersigned dated August 26, 2011, and accompanied by a psychiatric evaluation dated August 23, 2011 ("August 2011 Report"), indicates that Soberanis was "not suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damages to the property of another." (Gov't Ex. 4).

On September 9, 2011, a competency hearing was set for October 13, 2011, but because Soberanis tended to decompensate when transferred between facilities, the

6

undersigned ordered that Soberanis remain at FMC Butner until further order of the Court. [Doc. 178]. The competency hearing was later rescheduled for November 9, 2011. [Doc. 185].

On October 25, 2011, the parties stipulated to the admission of forensic evaluation reports dated March 23 and August 3, 2010, and July 29, 2011, with cover letters dated August 1, 23, and 29, 2011. [Doc. 196].[3]

On November 9, 2011, a competency hearing was held by video conference. Soberanis and his counsel were at Butner and government counsel, its expert witness and case agent, and the defense expert, were physically present in court before the undersigned. [Doc. 201; Doc. 204 (Transcript) ("T__")]. Forensic psychologist Dr. Glenn W. Ahava and DEA Agent Thomas Jackson testified, exhibits were admitted, and the hearing was to be continued until December 5, 2011. [Doc. 201].

A telephone conference was held on November 22, 2011. [*See* Dkt. Entry dated 11/22/11]. At the telephone conference, (1) the Government announced that it was not going to rely on Dr. Ahava's testimony and moved that his testimony be stricken; (2) the undersigned denied the Government's request to engage a new expert on the

_____

[3]      The undersigned notes that the dates indicated to be the dates of the cover letters are incorrect.

7

AO 72A
(Rev.8/8
2)

issue of competency and restorability; (3) the Government concluded that additional examination of defense witnesses was not necessary in light of the Court's rulings; (4) the undersigned indicated that it would recommend to the District Judge that Soberanis is currently not competent to stand trial and is not restorable; and (5) the Government moved that the dangerousness committee at Butner reconsider its no-dangerousness conclusion in light of Agent Jackson's testimony and other evidence, and Soberanis did not object. [*Id.*]. The hearing scheduled for December 5, 2011, was postponed until further notice following reconsideration of Soberanis's dangerousness by the committee at Butner. [*Id.*].

On December 8, 2011, the undersigned directed the Risk Assessment Panel ("Risk Panel" or "Panel") at FMC Butner to provide a report within ten days stating (1) whether it considered new evidence in reassessing Soberanis's dangerousness in conjunction with 18 U.S.C. § 4246, (2) the nature of the new evidence considered by the Panel, (3) whether the Panel had changed its opinion as a result of the new evidence, and (4) a detailed statement of reasons supporting its decision. [Doc. 208 ("December 2011 Order")].

A letter from the warden at FMC Butner to the undersigned dated December 14, 2011, is accompanied by a "forensic addendum" dated December 13, 2011

8

("December 2011 Forensic Addendum" or "Forensic Addendum"), and completed by Deputy Chief Psychologist Edwards Landis, Ph.D., and Jean P. Zula, M.D., (*id.* at 5). The Forensic Addendum addressed the questions identified in the December 2011 Order, ultimately concluding that the new evidence did not change the treatment team and Risk Panel's opinion regarding Soberanis's status with respect to the criteria set forth in 18 U.S.C. § 4246. (December 2011 Forensic Addendum at 2-5).

On December 21, 2011, a telephone conference was held, and the undersigned directed the Government to write the psychiatrists who wrote the December 14, 2011, report for Soberanis and to ask for clarification. [Doc. 212].

On December 29, 2011, Chief Psychiatrist Dr. Zula responded to the Government's clarification request (carbon copied by fax to the undersigned). ("FMC Butner Clarification Letter").

On January 17, 2012, the Government filed its "Memorandum of Law Regarding Competency Proceedings of Defendant Alejandro Acosta-Soberanis." [Doc. 214]. Soberanis filed his response on January 30, 2012. [Doc. 215]. The Government did not file a reply. [*See* Dkt.].

AO 72A
(Rev.8/8
2)

## II.    Facts

### A.    Agent Jackson's Testimony

Agent Jackson participated in the investigation, code-named "Operation Four Horsemen," that began in approximately October 2007 and that led to Soberanis's arrest. T8. Agent Jackson indicated that Soberanis was the head of an Atlanta-area cell of a large-scale Mexican drug-trafficking organization, which was itself headed by an individual identified as Chaparrito, the source of supply for the cocaine trafficking. T9. The DEA intercepted 18 cell phones associated with Soberanis. T12.

Agent Jackson testified regarding several intercepted calls. With respect to Session 760 (Gov't Ex. 8), a call recorded on July 4, 2009 (three days before Soberanis's arrest on July 7, 2009), between Soberanis and Chaparrito, Agent Jackson testified that he believed Soberanis and Chaparrito were negotiating the price for a shipment of 103[4] kilograms of cocaine to Atlanta, with a street value of approximately $2 million. T16-20. In Session 4 (Gov't Ex. 9, a series of synopses of calls), recorded April 22, 2008, between Soberanis and an individual identified as La Plaga, La Plaga discussed how she had heard from a third party that Soberanis was carrying guns on both hips at a party, and that he was "smitten with" another woman and had "forced

---

[4]        *See also* T36.

10

himself upon her." T21-24.[5] Soberanis denied La Plaga's assertion regarding the guns. T34.[6]

With respect to a series of calls conducted within an hour and a half on May 3, 2009 (Sessions 525, 526, 529, and 531), between Soberanis and Salvadaor Chavez (also known as Pomos),[7] Agent Jackson testified as follows: (1) in Session 525, Soberanis asked, "What's up with those," which according to Agent Jackson referred to "the cohete, literally refers to a rocket which from my experience and knowledge refers to a gun"; (2) in Session 526, Soberanis called Chavez and advised him to call "El Gordo" so "he" could lend Soberanis that gun, and Chavez asked (in code) whether Soberanis would like an AK-47 or a handgun; Soberanis replied that he was going to give the AK-47 to someone else but wanted the handgun for himself; (3) in Session 529, Chavez

---

[5]     Agent Jackson was not aware of any charge against Soberanis related to attacking a woman.  T33.

[6]     Soberanis was not charged with any weapons violations, T34, and Agent Jackson never saw Soberanis with any weapons during the period relating to his testimony (spring 2008 to July 2009), T35.

[7]     Ultimately, Chavez's body "was discovered tortured, duct-taped, and murdered" in Bartow County in fall 2008.  T24.  This was believed to be related to the drug business.  T25.  Agent Jackson noted that GBI agents had express interest in questioning Soberanis, T29, but Soberanis was never charged with kidnaping, murder, or attempted murder, although the investigation was still ongoing at the time of the hearing, T34-35.

11

asked whether Soberanis had picked up the gun, and Soberanis replied that he had sent a third party, "El Nino," to pick it up for him; and (4) in Session 531, Chavez asked if Soberanis had received "El Chiveto" (meaning the AK-47), and Soberanis replied that he was going to send someone to pick it up, and that tomorrow "they" were going to pick up "the slingshot" (meaning the handgun) to bring it to Soberanis. T24-26.

In Session 313, recorded July 21, 2009, between Soberanis and an associate of his identified as Domingo, Soberanis expressed being upset at an individual known as Chino because Chino had not paid Soberanis the money owed from a previous drug transaction. T26. Soberanis told Domingo that it was time Chino took care of the longstanding debt, and that Soberanis had decided that Chino's family was "going to get lifted" (i.e., kidnaped). T27-28.

In Session 314, dated August 11, 2008, between Soberanis and an unidentified male, the unidentified male expressed concern over taking on a large amount of cocaine, suggesting that they could get killed if they owed a large debt and lost the cocaine. T28. Soberanis suggested to the unknown male to only take on 20 kilograms for the moment, adding that if he got 100 kilograms and could not pay the money, he would be executed. T28.

12

In Session 303, dated October 27, 2008, between Soberanis and associate Aaron Medina Deniz, the parties discussed Chavez's being missing, and how they assumed he was dead. T28-29. Soberanis noted that he had distanced himself from Chavez because Chavez had been doing things that Soberanis did not like. T29.

In Session 235, dated January 7, 2009, between Soberanis and an individual identified as Don Sisi, Don Sisi asked Soberanis to bring Don Sisi his (Don Sisi's) gun because Don Sisi did not have one with him, and Soberanis agreed. T29-30.

In Session 889, dated January 17, 2009, "Daniel," another cell head, told Soberanis that he suspected there was a tracking device on his car, and he asked to use Soberanis's associates to put the car on a car lift to try to get the tracking device off. T30.

In Session 1197, dated January 21, 2009, between Soberanis and Nino, Soberanis complained about Nino not answering his phone, saying that there were people who would want to kill Soberanis because they were going to want their money back already. T31. Soberanis had been trying to assist others to obtain illegal United States visas allowing them to stay in the United States. T31.

In Session 54, dated May 22, 2009, Soberanis was speaking with a relative, Jose Antonio Acosta Soberanis ("Jose Antonio"), about the death of "Hugo," who

13

AO 72A
(Rev.8/8
2)

apparently died in Mexico. T31. Jose Antonio asked who killed Hugo, and Soberanis said that "they" walked into his house and shot him, that it was "those people because Hugo had been doing business with them." T31. Jose Antonio indicated that it might have been "Tule's" people. T31.

In Session 55, also dated May 22, 2009, between Soberanis and an unidentified female, the parties discussed Hugo's murder the previous evening. T31-32. Soberanis stated that Hugo was a good person but that Soberanis had advised him not to be doing what he was doing. T32.

On July 7, 2009, Soberanis was arrested. T32. He initially tried to escape through his bedroom window but then climbed back in, perhaps because of K-9 dogs barking in the area. T32. Soberanis spoke briefly with agents before telling them he did not want to answer any more questions. T32-33.

Soberanis's arrest put his cell out of business, T37, but Chaparrito has not been arrested, and he is believed to still maintain cells in the Atlanta area, T37-38.

AO 72A
(Rev.8/8
2)

## B. Dr. Ahava's Testimony

Dr. Ahava also testified at the hearing, T40-205, but the Government moved at a telephone conference on November 22, 2011, that his testimony be stricken, [*see* Dkt. Entry dated 11/22/2011]. The undersigned will therefore not consider his testimony.[8]

---

[8] Even had the Government not so moved, the undersigned would not have credited Dr. Ahava's testimony. Dr. Ahava appeared more interested in critiquing the Bureau of Prisons and Defendant's mental-health examiners than addressing the issues before the Court. His own credibility was lacking. Specifically, the Court finds that he attempted to exaggerate the times he was declared in court as an expert in forensic psychology, including evaluations of competency, restorability, and dangerousness, stating first that it was 75 or more times, T53, but then acknowledging that he was declared an expert when he had a bachelor of social work degree. T58-59. He then stated in response to the Court's question, moments later, that as a psychologist, he was a declared expert "[p]robably 30 or 40. I was mentally going over all these years." T61. He also was less than forthcoming about the medications he was on, which was not particularly relevant except that he contended that they were over-the-counter anti-depressants for migraine prophylaxis, and his answers were consistent with his prevarication on other subjects. T65. His testimony about inmate suicides was pure speculation and appeared to be without clinical verification. *See* T81-87. He testified frequently not as an expert but on personal experience. T95. His testimony about the literature concerning merits of live versus telephone translation services in psychological examinations appeared to have been made up. T99-102. Finally, on direct examination by Government counsel, he gave cogent, narrative-type answers, but during cross-examination conducted before the proceedings were suspended, Dr. Ahava was combative and less forthcoming.

AO 72A
(Rev.8/8
2)

## C.    Exhibits

The undersigned will now address the relevant exhibits that were presented at the hearing.[9]

### 1.    March 2010 Report, (Gov't Ex. 1)

The March 2010 Report was written by a staff psychiatrist and staff psychologist at FMC Butner, Drs. Kwanna Williams, M.D., and Carlton Pyant, Ph.D.  (March 2010 Report at 11).  The March 2010 Report initially notes that Dr. Flores conducted a psychological evaluation on November 1, 2009, and opined that Soberanis was not competent to stand trial because of his speech impediment (chronic, severe stuttering) and the severity of his depression, which was such that Soberanis's condition "would likely further deteriorate with the stress of a trial, very possibly increasing his risk of suicide."  (*Id.* at 1, 4-5).  Dr. Flores administered the Miller Forensic Assessment of Symptoms Test ("M-FAST") to assess whether Soberanis was malingering psychiatric symptoms.  (*Id.* at 4).  Soberanis's total M-FAST score was 1 out of 25, which "suggested he was likely not exaggerating psychiatric symptoms.  (*Id.*).  Dr. Flores diagnosed Major Depressive Disorder, Recurrent, Severe; Stuttering; Alcohol Abuse;

_____

[9]    Government Exhibits 1-7 were admitted at T38.  Government Exhibit 8 was admitted at T16, and Government Exhibit 9 was admitted at T21.

AO 72A
(Rev.8/8
2)

Cocaine Abuse; and Posttraumatic Stress Disorder (in partial remission). (*Id.*). Soberanis's Global Assessment of Functioning ("GAF") was 45.

Drs. Williams and Pyant agreed with Dr. Flores's diagnoses. (*Id.* at 9-10). Soberanis reported hearing voices but denied visual hallucinations, and there was no evidence of delusional ideation. (*Id.* at 6). Soberanis occasionally cut himself and was placed on suicide watch several times. (*Id.* at 6-8). Medication alleviated auditory hallucinations, but compliance with antidepressant therapy did not alleviate his severe depressive symptoms. (*Id.* at 8). Drs. Williams and Pyant opined that Soberanis's suicide risk was moderate to high. (*Id.*). They noted that he did not exhibit the ability to assist in his defense in any substantive manner because while Soberanis was able to understand the charges, he did not have a rational appreciation of pertinent information in his case. (*Id.* at 10). Ultimately, they contended that while Soberanis was not mentally competent at that time, the believed there was a substantial probability that his competency could be restored "in the foreseeable future" with continued treatment with psychotropic medications and individual counseling. (*Id.* at 11).

### 2. August 2010 Report, (Gov't Ex. 2)

The August 2010 Report was also completed by Drs. Williams and Pyant. (August 2010 Report at 10). Soberanis showed symptoms of anorexia, weight loss, and

17

intermittent period of food refusal, symptoms which were more prominent during exacerbations of his depressive illness. (*Id.* at 2-3). They noted a focus on the pharmacological management of Soberanis's symptoms. (*Id.* at 3). Soberanis endorsed a worsening of depression and active suicidal ideation. (*Id.* at 4). He continued to report auditory hallucinations, express chronic intermittent suicidal ideation, and engaged in episodic self-injurious behaviors despite full compliance with psychotropic medications. (*Id.*).

On the Test of Memory Malingering ("TOMM"), Soberanis's scores were "considerably lower than those with Cognitive Impairment, Aphasia, Traumatic Brain Injury and Dementia"; he would have scored higher simply by guessing. (*Id.*). Drs. Williams and Pyant concluded that the most plausible explanation was the feigning of memory impairment. (*Id.*).

Drs. Williams and Pyant diagnosed Soberanis with Malingering; Major Depressive Disorder, Recurrent, Severe; Posttraumatic Stress Disorder; Alcohol Abuse; Cocaine Abuse; and Personality Disorder Not Otherwise Specified ("NOS"), with a GAF of 25. (*Id.* at 7). With respect to the diagnosis of Malingering, which they noted was not a mental disorder, they noted that based on a review of a cross section of Soberanis's phone conversations, Soberanis's memory impairment appeared limited to

18

interactions with clinicians and defense counsel. (*Id.* at 7). They observed that even when his reported level of depression, inattentiveness, and suicidal ideation were described as most severe, his communication with his family by phone did not reflect severe psychiatric debilitation. (*Id.* at 8). They opined that Soberanis was not suffering from "a mental illness or defect rendering him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense." (*Id.* at 9). They thus stated that Soberanis was ready to return to court for continuation of his legal proceedings. (*Id.* at 10).

### 3. July 2011 Report, (Gov't Ex. 3)

The July 2011 Report was also completed by Drs. Williams and Pyant. (July 2011 Report at 9). Soberanis reported cutting himself, (*id.* at 4), and on July 6, 2011, he attempted suicide by tying a sheet around his neck and hanging from the door of a room, (*id.* at 5). He also intermittently engaged in head banging. (*Id.* at 6). "Of note, [Soberanis] has been prescribed a myriad of medications over the course of three FMC Butner evaluations with equivocal response, including citalopram, sertraline, bupropion, quetiapine, risperidone, haloperidol, and olanzapine." (*Id.*). Diagnoses including Major Depressive Disorder, Recurrent, Severe (Principal Diagnosis);

19

Posttraumatic Stress Disorder; Alcohol Abuse; Cocaine Abuse; and Borderline Personality Disorder, with a GAF of 25. (*Id.* at 6-7).

Drs. Williams and Pyant noted the previous evaluation's diagnosis of Personality Disorder NOS, stating that "[b]ased on serial interviews and clinical observation, over the course of three forensic evaluations, a more definitive diagnosis of Borderline Personality Disorder has been assigned." (*Id.* at 7). The observed behaviors consistent with this diagnosis included recurrent suicidal behavior, "gestures or self-mutilating behavior," and a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation. (*Id.*). They further observed that Soberanis continued to exhibit traits of avoidant personality disorder and dependent personality disorder. (*Id.*).

In conclusion, Drs. Williams and Pyant opined that Soberanis's "triad of chronic and severe psychiatric disorders" (Major Depressive Disorder, Posttraumatic Stress Disorder, and Borderline Personality Disorder) rendered him unable to properly assist in his defense, despite compliance with psychotropic medications. (*Id.* at 8). Although Soberanis's reported memory deficits and amotivation were, consistent with the findings of the August 2010 Report, more consistent with a desire to avoid potential legal consequences, Drs. Williams and Pyant concluded that because Soberanis's Major

AO 72A
(Rev.8/8
2)

Depressive Disorder impeded his ability to assist defense counsel, Soberanis was not competent to stand trial. (*Id.*). Further, they concluded that "due to the severity of his symptoms and the cyclical nature of the suicidal behavior," it was "highly unlikely" that he would be restored to competency in the foreseeable future. (*Id.*).

### 4. August 2011 Report, (Gov't Ex. 4)

The August 2011 Report was also completed by Drs. Williams and Pyant. (August 2011 Report at 6). Diagnoses included Major Depressive Disorder, Recurrent, Moderate-Severe; Posttraumatic Stress Disorder; Alcohol Abuse; Cocaine Abuse; and Borderline Personality Disorder, with a GAF of 25. (*Id.* at 3). The August 2011 Report noted that a Risk Assessment Panel was convened on August 22, 2011, in response to the Court's question whether Soberanis's mental disease or defect would create a substantial risk of injury to another person. (*Id.* at 4). The panel members included the Chief of Psychiatry and the Acting Deputy Chief of the Psychology Service. (*Id.*).

Drs. Williams and Pyant noted that while consistently accurate predictions of future dangerousness cannot conclusively be made by mental-health professionals, it is possible to estimate relative risk by considering several known historical and situational correlates of future violence. (*Id.*). The factors identified as pertinent in this case were past history of violence, mental illness, substance abuse, use of weapons,

AO 72A
(Rev.8/8
2)

social support, institutional adjustment, medication compliance, and a Risk Panel interview.  (*Id.* at 5-6).  With respect to these factors, Drs. Williams and Pyant noted the following: (1) Soberanis was the victim of early childhood physical abuse, but he denied thoughts of retaliation and had no history of violence toward others or the property of others; (2) he had no reported history of delusional ideation or command auditory hallucinations related to harming others or the property of others; (3) he indicated that he had been abstinent from all substances since 2008, and he denied a history of violent behavior in the context of substance use; (4) he denied ever owning or possessing firearms, although there was history of a weapons-related charge, based on a review of available records; (5) he maintained his relationship with his significant other and siblings, all of whom appeared supportive, although he did not consistently identify these relationships as a reason to continue his life; (6) he had not presented as a management problem during admissions to FMC Butner or other institutions, although he was passive and often nonverbal; (7) he had maintained compliance with treatment recommendations; and (8) his interview presentation was consistent with earlier described interactions (poor eye contact, blunted affect, difficult to engage, and answered most open-ended questions with "*no se*").  (*Id.* at 6).

AO 72A
(Rev.8/8
2)

After reviewing clinical data and conducting interviews, the "panel and treatment team members" opined that Soberanis

> does have a mental illness, however he does not meet the criteria for commitment as contemplated by Title 18, United States Code, Section 4246. If charges are dismissed a psychiatric evaluation should be conducted prior to his release to the community, to determine if Mr. Acosta-Soberanis meets criteria for involuntary commitment to a psychiatric facility due to risk of harm to himself.

(*Id.*).

## D.    Additional Materials

### 1.    December 2011 Forensic Addendum

In the Forensic Addendum, Drs. Landis and Zula indicate that the Risk Assessment Panel considered Agent Jackson's testimony and the transcripts of the monitored telephone conversations but that the Risk Assessment Panel and the treatment team "ha[d] not changed their opinion regarding [Soberanis's] status with respect to the criteria set forth in 18 USC 4246." (December 2011 Forensic Addendum at 2-3). The reasons for this decision were as follows:

> It is our understanding, based on regular participation in hearings pursuant to Section 4246, that the causal nexus between mental disease and/or defect and risk of harm as contemplated by the statute is not a trivial consideration for the committing court. While the manner in and extent to which the respondent's psychiatric condition "results in" substantial risk varies from case to case, a meaningful connection must

AO 72A
(Rev.8/8
2)

be demonstrated to satisfy the statute. Mere co-existence of psychiatric illness and risk has not proven sufficient, and filing a petition for commitment absent a meaningful basis for such a connection would be an unreasonable imposition upon the potential committing Court.

Defendant Alejandro Acosta-Soberanis's long-term clinical course, up to and including his arrest in the current matter, demonstrates the presence of a Personality Disorder. Such conditions, colloquially referred to as "character disorders," do not comport with the usual meaning of the terms "mental disease" or "mental defect" for the purpose of civil or quasi-criminal commitment. Rather, a personality disorder denotes a long-standing, deeply ingrained pattern of thinking, feeling, acting, and self-management that are "maladaptive" or undesirable. They are not conditions that befall an otherwise well-adjusted person, and by definition are evident in youth. Personality Disorders are not caused by injury, insult or abrupt derangement of biological processes. They do not produce demonstrable decline from a previous higher level of functioning, to which the affected individual may readily return with medication or other treatment. They are, in effect, descriptions of the individual and his habits, attitudes, and actions. Evidence also supports the opinion that the defendant abused substances while in the community, principally alcohol and cocaine. Substance misuse is unfortunately a common problem, both among those in the criminal justice system and among the population at large. For reasons outlined in earlier reports, Acosta-Soberanis may also suffer from Post-Traumatic Stress Disorder.

Available evidence, including the recently provided information regarding the defendant's involvement in the alleged offenses, suggests that he participated in a large-scale drug distribution enterprise with the additional complications of carrying and using firearms, kidnapping, and possible sexual assault. The actions attributed to him were clearly "dangerous" in the usual sense. Assuming that the defendant engaged in the actions charged as well as the asserted collateral misconduct, those behaviors lack causal nexus to the conditions described above. In our opinion the defendant involved himself in a criminal enterprise because

24

it was profitable, not because he experienced delusional beliefs such conduct was legally or morally justified, nor because hallucinated commands directed him to do so, nor because any of his historically diagnosable conditions motivated or caused such conduct. If he carried or used firearms, it was likely due to a well-founded belief he might need to protect himself. If he sexually abused one or more victims it was because he lacked scruples against such behavior. Of note, none of his pre-existing mental health conditions would tend to serve as excusing conditions under the law specifically because the untoward conduct does not derive from them. Mr. Acosta-Soberanis's criminal conduct, if proven, did not appear to result from the conditions evident prior to his arrest. During the pendency of his prosecution, Mr. Acosta-Soberanis experienced the onset of Major Depressive Disorder. In his case, this is manifest by depressed mood, markedly diminished interest/pleasure in the normal activities of life, significant weight loss requiring medical intervention, episodes of both agitation and of psychomotor retardation, fatigue, persistent sense of worthlessness and guilt, and recurring thoughts of death and suicide with multiple attempts. In this case, these symptoms do not portend increased risk of interpersonal violence or property damage. While Mr. Acosta-Soberanis's history reflects a criminal lifestyle with varied adverse impacts on others, his current impairments interfere with his potential to carry on his prior pursuits. In his current condition he would be unable to live independently, plan his own affairs, or collaborate with others. Paradoxically, the onset of this additional psychiatric condition may actually reduce his likelihood of acting in an untoward manner similar to that prior to his arrest.

In sum, Alejandro Acosta-Soberanis has a history of various diagnosable conditions that none the less do not comport with the legal concept of mental disease or defect. He appears to have engaged in criminal conduct which was or could be harmful to others for the usual reasons that others do. In the interim he has developed a psychiatric disorder requiring inpatient care. Despite aggressive treatment he remains grossly incapacitated. While he may be at risk for criminal recidivism at some point in the future, that is the case for numerous

AO 72A
(Rev.8/8
2)

individuals with and without mental disorders. Our staff could not in good faith petition for his commitment under Section 4246 as it does not appear his past dangerous behavior resulted from mental disorder nor that his current mental condition predisposes him to harm others.

(*Id.* at 3-5).

## 2. December 2011 FMC Butner Clarification Letter

In response to the Government's letter dated December 22, 2011, Chief Psychiatrist Dr. Zula responded as follows, referencing the Forensic Addendum:

Your letter cites out of context a section from page five of the addendum, specifically that the defendant "has a history of various diagnosable conditions that none the less do not comport with the legal concept of mental disease or defect." Those conditions would not in themselves warrant a finding of incompetence, in the same manner that they would not warrant a petition for civil commitment. Your letter also notes that the 08/01/11 cover letter accompanying a report by Drs. Williamson and Pyant stated that [Soberanis] suffers from a mental disease or defect rendering him incompetent to stand trial. You then ask how those statements can be reconciled. Following the former quoted material, the addendum continues: "In the interim he [Soberanis] has developed a psychiatric disorder requiring inpatient care," emphasizing the distinction between his longer-term history and his current functioning. Major Depressive Disorder does constitute a mental disease as we understand that legal term or art. The report by Drs. Williamson and Pyant describes the onset and relationship of MDD to [Soberanis's] competency-related impairment and explains their opinion that he is not competent to proceed. As your letter properly notes, the risk panel was solely focused on the issues outlined in section 4246 and our addendum did not comment upon his competence to stand trial. As described there, MDD does not appear to contribute to increased risk in this case.

26

In summary, [Soberanis's] psychiatric diagnoses include long-standing conditions that do not significantly impact his competence to stand trial nor his risk to persons or property. He currently also exhibits Major Depressive Disorder, which comports with the legal term "mental disease." While MDD renders him not competent to stand trial, it does not in our opinion cause the defendant to pose a risk of harm to persons or property.

(December 2011 FMC Butner Clarification Letter at 1-2).

## III.    Arguments of the Parties

### A.    Government's Motion

In its motion regarding Soberanis's competency proceedings, the Government first addresses 18 U.S.C. § 4241, which as characterized by the Government creates procedural processes regarding the hospitalized confinement of a criminal defendant who may be deemed mentally incompetent to stand trial. [Doc. 214 at 2]. The Government observes that the statute sets a standard of reasonableness as to the length of the confinement, [*id.* at 2-3 (citing *United States v. Magassouba*, 544 F.3d 387, 416 (2d Cir. 2008) (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)))], and that courts have discretion for determining the reasonable period of additional time that will likely restore a defendant to competency consistent with due process, [Doc. 214 at 3-4 (citing *Magassouba*, 544 F.3d at 406)]. According to the Government, the court in *Magassouba* found that additional confinement was justified because the defendant was

being confined not only to evaluate the probability of regaining competency but also, pursuant to the Bail Reform Act, 18 U.S.C. § 3142, because he was a risk of flight and danger to the community; the Government notes that Soberanis is similarly held as an indicted person who was deemed at the bond hearing to be a risk of flight and danger to the community. [Doc. 214 at 4]. The Government further notes that courts have allowed significant lengths of confinement and evaluation under § 4241(d) before turning to the statutory alternative of § 4246, [Doc. 214 at 5 (citing *United States v. Ecker*, 30 F.3d 966 (8th Cir. 2004))], and it observes that Soberanis faces a significant sentence and has only been in competency proceedings for approximately 24 months, [Doc. 214 at 6].

For all these reasons, the Government argues that a constitutional due-process analysis governs hospitalization of a charged defendant under § 4241, which analysis in this context would require that the current medical-evaluation finding that Soberanis is incompetent and not restorable be viewed in context with the August 2010 determination that he was competent, along with the previously diagnosed malingering. [*Id.* at 6-7]. As such, the Government believes that Soberanis should be detained under § 4241(d)(2) until the Court makes a final judicial determination that continued detention would violate Soberanis's constitutional due-process rights, a determination

28

that would presently be premature because of the conflicts in the clinical evaluations. [Doc. 214 at 7].

Next, the Government states that § 4246 (to which, along with § 4248, a defendant is subject at the end of the time period specified in § 4241) is inapplicable by its very terms, as it only ensures certain procedural safeguards with respect to the handling of those persons determined to be suffering from "a mental disease or defect as a result of which [the person's] release would create a substantial risk of bodily injury to another person"; yet here, "the Butner physicians" contend that Soberanis is not suffering from a mental disease or defect and that his release would not present a danger to any person. [Doc. 214 at 7-8].

Lastly, the Government contends that if the Court nevertheless determines that § 4246 applies, the Court can and should also make the legal determination that Soberanis's release would pose a danger to other persons. [Doc. 214 at 9]. The Government states that this would comport not only with Agent Jackson's testimony but also with Congress's clear pronouncement that there is a presumption that individuals for whom there is probable cause to believe they have engaged in major drug trafficking constitute an immediate danger to the community. [*Id.* (citing 18 U.S.C. § 3142(e)(3)(A))]. The Government then discusses various intercepted

AO 72A
(Rev.8/8
2)

recordings involving Soberanis about which Agent Jackson testified, including references to substantial quantities of cocaine, Soberanis's discussion about carrying guns, Chavez's murder, Soberanis's alleged forcing himself upon a woman, and Soberanis's reference to needing to kidnap an associate regarding a drug debt owed to Soberanis. [Doc. 214 at 10-11]. Further noted are earlier reports from medical providers detailing Soberanis's psychological problems and a substantial history of cocaine and alcohol abuse. [*Id.* at 11]. The Government observes that while the doctors at FMC Butner opined that Soberanis was suffering from a personality disorder but that such conditions "do not comport with the usual meaning of the terms 'mental disease' or 'mental defect' for the purposes of civil or quasi-criminal commitment," what constitutes a mental disease or defect is not a clinical determination but a legal one, and there is case law that supports treating personality disorders as mental disease or defects under the statutory scheme. [*Id.* at 11-12 (citing *United States v. Henley*, 8 F. Supp. 2d 503 (E.D.N.C. 1998); *United States v. Murdoch*, 98 F.3d 472 (9th Cir. 1996))]. The Government argues that it is unreasonable for FMC Butner to conclude that an individual who has engaged in the activities described by Agent Jackson, is suffering from some level of mental impairment, and has abused controlled substances

30

and alcohol for an extended period of time, would nonetheless represent no significant risk of danger to others if released.  [Doc. 214 at 12-13 (citing *Ecker*, 30 F.3d at 970)].

For these reasons, the Government requests that the Court continue the current hospitalization and monitoring of Soberanis under § 4241(d)(2) to determine when or if he will be restored to competency to stand trial, or, in the alternative, that the Court find that Soberanis is suffering from a mental disease or defect and that his release would create a substantial risk of bodily injury to another person.  [Doc. 214 at 13].

### B.    Defendant's Response

In response, Soberanis first contends that this is not the case of dueling expert opinions, but rather the government experts have all opined that Soberanis is not competent to stand trial and is not restorable.  [Doc. 215 at 6].

Second, Soberanis disagrees with the Government's argument that § 4246 is inapplicable because the charges have not been dismissed and the necessary certification from the facility housing Soberanis has not been made, stating that this argument is specious because it was the Government who requested the evaluation pursuant to § 4246 prior to formal findings being made by the Court.  [Doc. 215 at 6-7].

31

Third, Soberanis observes that the Government's interpretation of § 4246 would mean that anyone charged with a crime relating to drugs or violence should be considered dangerous.  [Doc. 215 at 7].

Fourth, Soberanis cites *United States v. Baker*, No. 08-30002-001, 2010 WL 1742222 (W.D. Ark. Apr. 29, 2010),[10] noting that it involved FMC Butner, Drs. Zula and Landis, the risk panel, and the statutory process involved in this case. [Doc. 215 at 7].

Fifth, Soberanis contends that, pursuant to § 4246(e), a certificate is only required if a person has recovered or if the person to found to be dangerous, neither of which pertain here.  [Doc. 215 at 7].

Sixth, Soberanis distinguishes *Magassouba*, noting that the parties in that case agreed that the defendant's competency was restorable, but the government experts here have concluded that Soberanis is not competent, not restorable, and not dangerous.  [*Id.* at 8].  Soberanis notes that § 4241(d) provides for a defendant's confinement when it is determined that his mental condition can be improved within additional time, but government experts have made it clear that this will not occur, and this provision

_____

[10]     Soberanis's brief incorrectly suggests that this is an Eighth Circuit opinion. [*See* Doc. 215 at 7].

AO 72A
(Rev.8/8
2)

cannot be used to hold a defendant indefinitely, because such indefinite custody would surely violate the defendant's constitutional rights, even if not the Speedy Trial Act. [Doc. 215 at 8].

Seventh, Soberanis notes that the Government's memorandum neglects to assert that a competency hearing was held on November 9, 2011, and that the Government moved to strike the testimony of their second, privately retained expert, Dr. Ahava. [*Id.*].

Eighth, Soberanis distinguishes *Ecker*, noting that in that case the defendant was found to be dangerous and was seeking hospitalization in a state facility. [*Id.* at 9].

Finally, Soberanis states that it is faulty to rely on evaluations from 2010 that have since changed. [*Id.*]. He contends that the evaluators' changed their opinions due to changes in Soberanis's circumstances, and he notes that these are the same government experts who have observed Soberanis for seven days per week, twenty-four hours per day. [*Id.*]. He further notes that it was the Government that concluded in the November 22, 2011, telephone conference that additional examination of defense witnesses was not necessary in light of the Court's rulings. [*Id.*].

For all these reasons, Soberanis requests dismissal of the two instant cases. [*Id.* at 10].

AO 72A
(Rev.8/8
2)

## IV.    Discussion

### A.    Competency and Restorability

"The Due Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is incompetent." *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)).  An individual is considered competent to stand trial when he has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and he has a rational and factual understanding of the proceedings against him.  *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003); *see also Dusky v. United States*, 362 U.S. 402 (1960); 18 U.S.C. § 4241(a), (d), (e) (noting that a court must find a defendant incompetent when a preponderance of the evidence shows that "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense").  The following factors are relevant in assessing competency: "a defendant's past medical history, the opinion of psychiatric experts, and the defendant's behavior during trial." *Woodall v. Foti*,

34

648 F.2d 268, 273 (5th Cir. Unit A, June 16, 1981).[11] Binding precedent in this Circuit places upon the government the burden of proving that a defendant is competent to stand trial. *United States v. Izquierdo*, 448 F.3d 1269, 1277 & n.7 (11th Cir. 2006) (citing *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976)).[12]

---

[11] "In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), [the Eleventh Circuit] adopted as binding precedent all cases decided by the Fifth Circuit, including both Units A and B, prior to October 1, 1981." *Ga. Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1290 n.1 (11th Cir. 2007).

[12] Congress requires the following procedures to be followed in making competency determinations. Following a motion from the defendant or the government and a hearing, a court shall find the defendant incompetent if a preponderance of the evidence demonstrates that "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a), (d). Once the defendant is found mentally incompetent, the defendant is committed to the Attorney General who shall hospitalize the defendant for treatment. 18 U.S.C. § 4241(d).

When "the director of a the facility in which a defendant is hospitalized . . . determines that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense," the director shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. 18 U.S.C. § 4241(e). A court must then hold a hearing, conducted pursuant to the provisions of section 18 U.S.C. § 4241(d), to determine the competency of the defendant. Following the hearing, the court will find an individual competent if a preponderance of the evidence shows "that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense." 18 U.S.C. § 4241(e).

Here, the government has failed to meet its burden of showing that Soberanis is competent to stand trial. The July 2011 Report – the most recent forensic evaluation addressing Soberanis's competency to stand trial and restorability – indicates that Soberanis is neither competent nor restorable, (*see* Cover Letter to July 2011 Report; July 2011 Report at 7-8), and this evidence has not been rebutted. In light of this unrebutted evidence, it is plain that the Government has not shown by a preponderance of the evidence that Soberanis is currently competent to stand trial or that his competency is capable of being restored.

The undersigned is not persuaded by the Government's argument, relying upon *Magassouba* and *Ecker*, that it is too early to make these determinations. First, *Magassouba* is distinguishable on the grounds that the parties there agreed that the defendant's competency was restorable. 544 F.3d at 396-97. Also, the undersigned is not persuaded by the Government's argument that additional confinement is currently justified to see if Soberanis regains his competency. While Soberanis has been declared competent in the past, the Bureau of Prisons authorities have concluded that he is presently incompetent and not restorable. There is no evidence in the record that these determinations are incorrect or that with any period of time their conclusions would change.

36

Next, to the extent that the Government's contention that it is too early to make a final determination is based on the seriousness of the charges against Soberanis and that further detention is justified due to his pretrial detention on dangerousness grounds, the Court concludes that the Government is mixing apples with oranges. It asks the Court to wholesale read the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, into the statutes concerning a defendant's mental competency. The intersection of an incompetency proceeding and the Bail Reform Act occurs when a defendant has "recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense," 18 U.S.C. § 4241(e), and as a result is discharged from the facility where he was hospitalized in order to be tried. The statutory requirements in dealing with a defendant who is not so restored, 18 U.S.C. §§ 4241(d), 4246, make no reference to the Bail Reform Act for a logical reason: that Act primarily pertains to detention or release for persons awaiting trial or appealing convictions, not those who are not capable of being tried because they have been found incompetent to stand trial. In addition, although the Government argues that Soberanis should be found to be dangerous since he was deemed at the bond hearing to be a flight risk and a danger to the community, the current unrebutted evidence in this case indicates that Soberanis is *not* "presently suffering from a mental

37

disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," *see* 18 U.S.C. § 4246(d). Although the Government was justified in asking for Soberanis's pretrial detention under the Bail Reform Act, the standards for detention under that statutory scheme and the incompetency regime are different, and all available and admitted evidence indicates that Soberanis is not currently a risk to others as a result of his mental disease or defect, as required by § 4246(d). As for his risk of flight, again that is a consideration that the Court must determine under the Bail Reform Act in deciding whether one is to be detained *pending trial*, and is a separate inquiry from dangerousness under the Bail Reform Act. *See United States v. Whitehurst*, 116 F.R.D. 511, 516 (D. Minn. 1987). It is not clear what the Government's argument is intended to mean in the present context: what is at issue is whether the government may continue to confine Soberanis at all, not whether there is a risk of him not appearing for a future court date or other compelled appearance.

Further, the undersigned rejects the assumption underlying the Government's request that "the current medical evaluation finding that the Defendant is incompetent and not restorable be viewed in context with the August 2010 determination that he is competent," [Doc. 214 at 6-7]. That Soberanis was earlier deemed competent is not

inconsistent with the current determination that he is incompetent – it could simply mean that he was once competent but is no longer so.  Absent some indication that the most current evaluation is incorrect, the undersigned will not assume its incorrectness merely because an evaluation produced a year earlier yielded a different result.  For these reasons, the undersigned also rejects the Government's argument under *Ecker* that additional confinement time to evaluate the possibility of regaining competency is justified.  In *Ecker*, there was delay because at times the defendant was competent and at times he was not, but the critical, undisputed point in *Ecker*, distinguishing it from this case, was the medical conclusion that he was restorable.  *See Ecker*, 30 F.3d at 970. In addition, in *Ecker*, the evidence demonstrated that the defendant was dangerous under § 4246.  *See Ecker*, 30 F.3d at 970-71.  Again, the evidence in this case is to the contrary.  As a result, *Ecker* does not instruct the Court on how to proceed in this matter.

Thus, based on the record evidence before the Court, the undersigned **RECOMMENDS** that Soberanis be declared **NOT COMPETENT TO STAND TRIAL** and **NOT RESTORABLE**.

39

**B.    Dangerousness**

The competency hearing in this case was held on November 9, 2011. [Doc. 201].

Pursuant to 18 U.S.C. § 4241,

> If, after the [competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility–
>
> > (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and
> >
> > (2) for an additional reasonable period of time until–
> >
> > > (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or
> > >
> > > (B) the pending charges against him are disposed of according to law;
> > >
> > > whichever is earlier.
>
> If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit

AO 72A
(Rev.8/8
2)

proceedings to go forward, the defendant is subject to the provisions of
sections 4246 and 4248.

18 U.S.C. § 4241(d).

Here, the four months described in § 4241(d)(1) have already passed, so the

undersigned turns to the "additional reasonable period of time" under § 4241(d)(2).

That time has ended, because the undersigned in this Report and Recommendation

("R&R") concludes that Soberanis is not competent and not restorable, and therefore

§ 4241(d)(2)(a) cannot be satisfied. *See* 18 U.S.C. § 4241(d)(2)(a) (". . . *if* the court

finds that there is a substantial probability that within such additional period of time he

will attain the capacity to permit the proceedings to go forward") (emphasis added).

Because § 4241(d)(2)(a) is extinguished, and because the earliest triggering of the

provisions under § 4241(d)(2) activates the concluding paragraph of § 4241(d), the

undersigned turns to that provision. Under that provision, because the undersigned has

"determined that the defendant's mental condition has not so improved as to permit

proceedings to go forward," Soberanis is then "subject to the provisions of

sections 4246 and 4248." 18 U.S.C. § 4241(d). No one contends that § 4248 ("Civil

commitment of a sexually dangerous person") is relevant, so the undersigned turns to

41

§ 4246 ("Hospitalization of a person due for release but suffering from mental disease or defect").

Pursuant to 18 U.S.C. § 4246,

> If the director of a facility in which a person is hospitalized certifies that a person in the custody of the Bureau of Prisons whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person, is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined. The clerk shall send a copy of the certificate to the person, and to the attorney for the Government, and, if the person was committed pursuant to section 4241(d), to the clerk of the court that ordered the commitment. The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.

18 U.S.C. § 4246(a).

This provision fits awkwardly into the present case, because the trigger for a dangerousness hearing is a certification from the director of FMC Butner saying that Soberanis "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious

42

damage to property of another, and that suitable arrangements for State custody and care of the person are not available," 18 U.S.C. § 4246(a). Given the most recent determinations (the December 2011 Forensic Addendum and the December 2011 FMC Butner Clarification Letter) that Soberanis is *not* a risk to others, it is unlikely that any such certification will be forthcoming. This is problematic for present purposes because § 4246 presents no clear alternative. *See United States v. Jackson*, Criminal Action No. 03-173-04, 2009 WL 691973, at *3 (E.D. Pa. Mar. 16, 2009) ("[S]everal courts have recognized that § 4246 contains troubling gaps in the statutory scheme.") (alteration added) (citing cases) (internal quotation marks omitted); *see also United States v. Wheeler*, 744 F. Supp. 633, 636 (E.D. Pa. 1990) (noting the "black hole" of legislation in § 4246). Subsection (e) of that provision does provide for discharge after certification from the facility director that "the person has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another," but that is only with respect to a person hospitalized pursuant to subsection (d), which provides for the commitment of a person *after* the dangerousness hearing, which only comes about at all pursuant to subsection (a), *see Bonin*, 541 F.3d at 400-01 ("Section 4246(a) establishes the director's certification as a necessary prerequisite to

AO 72A
(Rev.8/8
2)

a dangerousness hearing; without the certification, a court ordinarily lacks statutory authority to conduct the hearing." (citing *United States v. Lapi*, 458 F.3d 555, 562 (7th Cir. 2006) ("To the extent that the Government withdraws a Certificate because this statutory mandate is not fulfilled, as it did here, the district court has no statutory authority to conduct a dangerousness hearing."); *Weber v. U.S. Dist. Court*, 9 F.3d 76, 79 (9th Cir. 1993) ("The district court lacked the authority to initiate a hearing to determine whether Weber should continue treatment in a psychiatric facility. Section 4246 indicates that the director of the facility is to make the initial determination regarding the dangerousness issue."); *United States v. Baker*, 807 F.2d 1315, 1324 (6th Cir. 1986) ("We hold, therefore, that by failing to adhere to the procedures outlined in section 4246, the district court lacked statutory authority to commit Baker . . . .") (alteration in *Bonin*)).[13] *See* 18 U.S.C. §§ 4246(a), (d), (e).

---

[13]     As the Ninth Circuit observes, some courts have ignored the issue where it was not raised:

> The government points to decisions affirming a defendant's hospitalization under § 4246, even though the district court sent the defendant for evaluation of the defendant's dangerousness after finding he was unlikely to regain competence, but before a dangerousness certificate was filed. *See United States v. Ecker*, 30 F.3d 966, 968 (8th Cir. 1994); *United States v. Sahhar*, 917 F.2d 1197, 1199 (9th Cir. 1990). In neither of these cases, however, did the defendant argue on appeal that the district court lacked authority to order that evaluation or

44

It cannot be the case, however, that Soberanis is confined in perpetuity, despite

being incompetent to stand trial, on the grounds that no dangerousness hearing can be

held given that no certification under § 4246(a) will ever be issued because Soberanis

has already been deemed not dangerousness by FMC Butner. *Cf. Baker*,

2010 WL 1742222, at *3 ("While the statute is silent as to precisely what course of

action is to be taken if a 'certificate of dangerousness' be not issued, the Court believes

it is fairly to be inferred from the language of the statute that, in the absence of same,

the defendant must be released."). In fairness, the Government does not make such an

argument, but the argument it does make – that Soberanis remain hospitalized and

monitored "to determine when or if he will be restored to competency to stand trial,"

[Doc. 214 at 13] – is little different in practical effect, given that the undersigned has

concluded based on the evidence presented that Soberanis is not competent to stand

trial and is not restorable. Taking as true the uncontested evidence in this case, the time

when Soberanis is competent to stand trial will not come. The Government is merely

---

contend the FMC director never should have had an opportunity to file a
dangerousness certificate to trigger a § 4246(a) dangerousness hearing.
Thus, the cases cited by the government did not address the issue we now
face.

*U.S. v. Godinez-Ortiz*, 563 F.3d 1022, 1031 (9th Cir. 2009).

45

AO 72A
(Rev.8/8
2)

continuing to fight the uncontested evidence in this case. Of course, the evaluators at FMC Butner could be wrong, but there is no evidence in the record that would reasonably allow the conclusion that this is the case, and thus the Government's position appears to be mere speculation.

Nor does the Government's alternative relief provide a solution. The Government asks the Court to conclude that Soberanis's release would create a substantial risk of bodily injury to another person, [Doc. 214 at 13] – in other words, it asks the Court not only to ignore the unrebutted evidence discussed above but that also the Court now determine (evidently without waiting for any certification from the facility director) that Soberanis is dangerous. Although parties are permitted to make contradictory alternative arguments, the Government's alternative argument assumes the logic of Soberanis's position – that is, that no certification is required before making a dangerousness determination. Were the Court to adopt this position and decide Soberanis's dangerousness, Soberanis could easily be deemed not dangerousness, based on unrebutted evidence.[14, 15] Nevertheless, despite the procedural awkwardness, and

_____

[14]     The undersigned is unpersuaded by the Government's contention that Soberanis is "dangerous" because of Agent Jackson's testimony and the allegedly "clear" pronouncement by Congress that those who engage in major drug trafficking constitute an immediate danger to the community, [Doc. 214 at 9 (citing 18 U.S.C. § 3142)]. First, even were the presumption of § 3142 applicable to the present case, it

46

to the extent possible, the undersigned will avoid bypassing the certification

requirements discussed in § 4246, by fashioning the following remedy: the undersigned

**RECOMMENDS** that the Attorney General be **DIRECTED** to ensure that a formal

---

would be rebutted by the unrebutted evidence in this case that Soberanis is not dangerous to others. Second, by citing Agent Jackson's testimony at all, the Government implicitly rejects any interpretation of the dangerousness inquiry that would suggest that those allegedly involved in drug trafficking are automatically deemed dangerous for the purposes of § 4246. Third, the Bureau of Prisons clearly rejects such an interpretation as well, focusing instead on the danger posed by Soberanis's mental diseases or defects, not the dangerousness of the actions attributed to him. Fourth, and most importantly, the statute itself rejects the Government's interpretation, because it asks whether Soberanis "is presently suffering from a mental disease or defect *as a result of which* his release would create a substantial risk of bodily injury to another person or serious damages to the property of another," 18 U.S.C. § 4246 – thus, the dangerousness must derive from mental disease or defect. *See United States v. Williams*, 299 F.3d 673, 676 (8th Cir. 2002) ("[Section 4246] requires a direct causal nexus between the mental disease or defect and dangerousness." (citing *Ecker*, 30 F.3d at 970 (finding evidence sufficient to prove defendant's dangerousness was the "result of" his mental condition); *United States v. Murdoch*, 98 F.3d 472, 476 (9th Cir. 1996) ("If the person has dangerous propensities, but these propensities are not the result of a mental disease or defect, continued confinement is not justified . . . .").

[15] The undersigned does not find meaningful the Government's suggestion that Soberanis's personality disorders should be considered mental diseases or defects, [Doc. 215 at 11-12]. Although the cases the Government cites indicates that some courts do indeed consider personality disorders to be mental diseases or defects (unlike the evaluators here), the distinction is not relevant to the present case because there is no indication that Soberanis's Borderline Personality Disorder makes him dangerous. To the contrary, Dr. Zula wrote that Soberanis's "psychiatric diagnoses include long-standing conditions that do not significantly impact his competence to stand trial *nor his risk to persons or property*." (FMC Butner Clarification Letter at 2).

47

certification under § 4246 be made from the director of FMC Butner,[16] answering the following question to the closest approximation: whether Soberanis "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and . . . suitable arrangements for State custody and care of the person are not available," 18 U.S.C. § 4246(a); or whether he "has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another," 18 U.S.C. § 4246(e). If the answer is the latter, the relevant court may then conduct a hearing "to determine whether [Soberanis] should be released." 18 U.S.C. § 4246(e).[17]

_____

[16]    The undersigned notes that certification is made "to the clerk of the court for the district in which the person is confined." 18 U.S.C. § 4246(a).

[17]    As noted by Soberanis, [Doc. 215 at 7], in *Baker*, a case from the Western District of Arkansas involving not only FMC Butner but Drs. Zula and Landis specifically, the court noted that a report from Drs. Zula and Landis concluded that the defendant was not suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property another, and they accordingly declined to issue a certificate of dangerousness under § 4246(a). *Baker*, 2010 WL 1742222 at *1. The district judge stated that "it is apparent that no certificate of dangerousness will be issued by the Center," and declined to adopt the portion of the magistrate judge's R&R recommending that the defendant be transferred to another federal medical facility for a second opinion, because "[t]he Court's research concerning the issue has turned up no authority suggesting that the Court may take that action." *Id.* at 3. Although it is

AO 72A
(Rev.8/8
2)

## V.    Conclusion

For the reasons above, the undersigned **RECOMMENDS** that Soberanis be declared **NOT COMPETENT TO STAND TRIAL** and **NOT RESTORABLE**. Further, the undersigned concludes that the Court is precluded at this time from determining Soberanis's dangerousness, but **RECOMMENDS** that the Attorney General be **DIRECTED** to effect formal certification regarding Soberanis's dangerousness, as discussed above.

The Clerk is further **DIRECTED** to terminate the referral to the undersigned

**IT IS SO DIRECTED AND RECOMMENDED,** this the 3d day of April, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

similarly apparent here that no certificate of dangerousness will be issued (and thus directing a formal certification may initially appear to be only a wasteful exercise), as discussed above, the cases from several circuit courts of appeals suggest that a court has no statutory authority to conduct a dangerousness hearing absent certification. Although, as noted in *Baker*, the statute does not address the specific situation that exists in this case, the undersigned's suggested remedy appears to be the solution that best comports – to the extent possible – with § 4246.

AO 72A
(Rev.8/8
2)